304 Ga. 740
FINAL COPY

S18A1155. DOLEMAN v. THE STATE.

MELTON, Chief Justice.

Following a jury trial, Dantevoise J. Doleman appeals his convictions for murder and related crimes, contending, among other things, that the trial court made certain evidentiary errors and that the evidence was insufficient to support the verdict.[1] For the reasons set forth below, we affirm.

---

[1] On January 20, 2015, a Muscogee County grand jury returned a 21-count indictment charging Doleman, Edward Lee, and Demetrice Octavian Scott with a series of offenses. Doleman was indicted in fifteen of the twenty-one counts; two were nol prossed before trial. Doleman and Scott were indicted for the armed robbery of Patricia Banks (Count 1) and possession of a firearm during commission of a crime (Count 2) on December 15, 2011; all three were indicted for the armed robbery of Julane Fleming (Count 3) and possession of a firearm during commission of a crime (Count 4) on December 15, 2011; Doleman and Scott were indicted for the burglary (Count 8) and theft by taking (Count 9) of Sarai Watters on December 21, 2011; all three were indicted for the malice murder (Count 10), felony murder (Counts 11 and 13), armed robbery (Count 12), and aggravated assault (Count 14) of Charlie Artis on January 5, 2012; all three were indicted for the burglary (Count 16) of Felicia Scott on January 11, 2012; all three were indicted for the burglary (Count 17) and aggravated assault (Count 18) of R. L. on January 15, 2012; and all three were indicted for the theft by taking (Count 21) of Carolyn Evans on January 19, 2012. At a joint trial with

1. In the light most favorable to the verdict, the record shows that Doleman, Edward Lee, and Demetrice Octavian Scott (collectively "the co-defendants") were close friends who intermittently lived together at the home of Scott's cousin, Karen Gibson ("Karen"). Between December 15, 2011, and January 20, 2012, the co-defendants planned and executed a series of crimes in the Muscogee County area. Scott, who testified during the trial of Lee and Doleman, recounted these events.

(1) On December 15, 2011, Patricia Banks was approached in the Columbus Clinic parking lot by Doleman and Scott. Doleman pointed a gun at

---

Lee on May 9-24, 2016, Doleman was convicted of all thirteen counts remaining against him. Doleman received a life sentence for malice murder (Count 10); a life sentence for each armed robbery (Counts 1, 3, and 12), to run concurrently with each other and consecutively to the malice murder sentence; twenty years each for burglary (Counts 16 and 17) and aggravated assault (Count 18), to run concurrently with each other and with the life sentence for count 12; five years for the count 2 firearm possession, to run consecutively to the life sentence for count 1; five years for the count 4 firearm possession, to run consecutively to the life sentence for count 3; and twelve months for theft by taking (Count 21), to run consecutively to count 12. The felony murders (Counts 11 and 13) were vacated by operation of law; the remaining aggravated assault (Count 14) merged into count 10. On May 25, 2016, Doleman filed a timely motion for new trial, which he amended on October 12, 2017. On March 20, 2018, the trial court denied the motion, and Doleman filed a timely notice of appeal on March 26, 2018. The appeal was docketed in this Court for the August 2018 term and submitted for decision on the briefs.

Banks and ordered her out of her Kia Sportage ("Kia"), and the two men drove off in the vehicle.[2]

(2) On December 15, 2011, the co-defendants drove the Kia to a nearby apartment complex. While Doleman was in the Kia, Lee and Scott approached Julane Fleming with a stolen .38 revolver[3] and a paintball gun and stole her 2000 RX 300 Lexus ("Lexus"). Lee then drove off in Fleming's Lexus while Doleman and Scott drove off in the Kia.

(3) On December 20, 2011, Scott and Lee attempted to commit armed robbery against Surendrakumar Patel at the Hometown Grocery in Muscogee County.

(4) On December 21, 2011, Doleman was driving Scott around in the stolen Kia, and they broke into the home of Sarai Watters. Scott stole a laptop, the key to a Chevy Equinox, and a cell phone, and Doleman stole a flat-screen television. The next morning, Lee joined Scott and Doleman, and the co-defendants walked back to the residence to steal the Chevy Equinox. Lee later

---

[2] The weapon was a BB gun, which appeared to be a real gun to the victim during the robbery.

[3] The co-defendants stole the .38 revolver from the car of an acquaintance known as "Spin."

crashed the vehicle into a light pole, and the co-defendants fled the scene.

(5) On January 5, 2012, Charlie Artis was shot dead at his barber shop on Gunboat Drive.[4] Multiple witnesses in the area at the time confirmed that a man with a blue jacket, later identified as Lee, ran from the scene toward a green car. Scott testified that the co-defendants planned to rob Artis on this day, and both he and Doleman waited for Lee in a green Mercury car, previously procured by Doleman.

(6) On January 11, 2012, the co-defendants invaded the home of Felicia Scott, taking her television, laptops, and a red and white jacket. Demetrice Scott testified that, when turned on, the television had three lines going across its screen.

(7) On January 15, 2012, the co-defendants committed another robbery, breaking into the home of R. L. at 23 Street and East Highland in Muscogee County. During the invasion, Scott held R. L. at gunpoint with a .32 revolver while Doleman and Lee went through all of her belongings. After Doleman and Lee left the house, Scott raped R. L. She reported that Scott was wearing a red

---

[4] The bullets found in Artis's body were for a .38 revolver.

4

and white jacket during the attack.

(8) A few days later, the co-defendants gave Joshua Myers a revolver and a flat-screen television in exchange for tattoo work. However, when Myers learned the television did not work properly because there were three lines running across it when it was turned on, he told the co-defendants he would not finish the remainder of the tattoo work and sold the television. The co-defendants then stole Myers's Xbox 360, and, in response, Myers informed the police that the co-defendants were staying at the home of Karen.

After arriving at Karen's house, Officer Michael Vega knocked on the front door, and Officer Jason Mann observed three men running out the back door and ordered them back inside the house. Karen answered the front door and reported that no one was inside the residence, but officers saw Scott standing inside the house. When asked, Scott denied possessing an Xbox and offered to show the officers into the shared bedroom of Karen, Doleman, and Lee to prove the fact. Upon entering the room, the officers could see that there was an Xbox 360 controller under the bed and placed Scott into custody. Thereafter, the officers obtained consent from Karen to search the entire residence, and they found Doleman and Lee as well as the Xbox game console in another room. In

5

their search of the house, the officers also discovered a .38 revolver underneath a mattress in the same room where they saw the Xbox controller. Karen told the officers that she had seen Doleman and Lee with a .38 revolver on occasion, and that occasionally Lee would carry his gun in the hood of his blue jacket.

At trial, a number of witnesses testified regarding the close relationship of the co-defendants and their commission of the crimes. First, Scott, who had pled guilty to the offenses charged against him, testified about the details of each of the robberies, as well as the specific incidents where Doleman was present and involved. Scott also testified that Lee was wearing a blue jacket and in possession of a .38 revolver on the day Artis was shot. And the .38 revolver was recovered by police at the home of Karen. Karen, who was dating Doleman and Lee at various points throughout the time period when the co-defendants were residing at her house, testified that she saw both Doleman and Lee, at different times, with a .38 revolver. Karen also testified that she heard the co-defendants talk about a home robbery during which Scott raped the inhabitant. Cymon Gibson ("Cymon"), Scott's sister who is also Karen's cousin and who lived at Karen's home during the same time period as the co-defendants, testified that she also saw Doleman with a .38 revolver and Lee with a .32

6

revolver. Cymon said she moved out of Karen's house around January 7, 2012 because the co-defendants were bringing stolen goods back to Karen's house, including flat-screen televisions, a Kia, and a Lexus. Cymon testified to seeing Scott and Doleman inside the Kia and Scott inside the Lexus. In addition, Darien Gibson, Karen's brother who also lived with Karen during the same time as the co-defendants, saw the Kia and Lexus in the back yard of Karen's house during the time the co-defendants were residing there.

Doleman contends that there was insufficient evidence to convict him of the crimes charged in the indictment, specifically as to the murder and armed robbery of Charlie Artis. We disagree. This evidence was sufficient to enable the jury to find Doleman guilty beyond a reasonable doubt of the crimes for which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-21 (convictions of party to a crime); Parks v. State, 272 Ga. 353, 354-355 (529 SE2d 127) (2000).

2. Doleman contends that the trial court erred by failing to suppress evidence obtained during the search of Karen's home. We disagree.

Prior to trial, co-defendant Lee filed a motion to suppress all evidence

seized during the warrantless search,[5] including a pistol, an Xbox controller, and an Xbox game console. Doleman joined Lee's motion. After initially denying the motion on March 4, 2016, the trial court conducted an evidentiary hearing on March 14, 2016, whereupon the State called Karen and Officer Mann, the officer who led the search of the residence. After the hearing, the trial court concluded Doleman and Lee had standing to file a motion to suppress based on their reasonable expectation of privacy in the premises searched, but denied the motion based on the findings that (1) Doleman and Lee lacked standing to challenge the seizure of the gun since neither claimed ownership of it, and (2) there was consent to search given by the primary homeowner.

When the facts are disputed on a motion to suppress, the trial court's ruling will be reviewed to determine whether it was "clearly erroneous." Hughes v. State, 296 Ga. 744, 746 (770 SE2d 636) (2015). In doing so, this Court construes the evidence most favorably to upholding the trial court's findings and judgment and will not disturb the trial court's findings of fact if there is any

---

[5] The motion complained of a warrantless search of 1416 19th Street, Apartment B, Columbus, Georgia on January 19, 2012. Doleman, Scott and Lee were residing at the aforementioned address at the time of the search. The primary tenant of the residence was Karen.

evidence to support them. Id.

We affirm the trial court's ruling that Doleman had standing to challenge the search based on his status as an overnight guest. Minnesota v. Olson, 495 U. S. 91, 96-97 (II) (110 SCt 1684, 109 LE2d 85) (1990) ("[Defendant's] status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."); Smith v. State, 284 Ga. 17, 21 (663 SE2d 142) (2008). Further, the trial court appropriately found evidence to support the warrantless search. Georgia v. Randolph, 547 U. S. 103, 106 (126 SCt 1515, 164 LE2d 208) (2006) ("The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained."). Officer Mann testified at the hearing that, on the day of the search, the officers were given consent to enter the premises by Scott, and consent to conduct the search of Karen's residence and shared bedroom by Karen. Further, Doleman's presence in the residence did not negate Karen's consent because, "[where the defendant] was physically present but failed to express any refusal of consent or any

9

objection to a police search . . . the [primary] owner's consent to the search gave the officers legal authority to search the residence." (Citation and punctuation omitted.) Rockholt v. State, 291 Ga. 85, 88 (2) (727 SE2d 492) (2012). Accordingly, the trial court did not err by denying the motion to suppress the evidence in question.

3. Doleman contends that the trial court erred by denying his motion to sever the offenses of the murder and robbery of Charlie Artis from all other offenses included in the indictment because several of the offenses applied only to Doleman's co-defendant Lee, and several offenses did not occur on the same day as the murder and robbery.[6] We disagree.

Prior to trial, Doleman filed a motion to sever the offenses for trial.[7] On March 4, 2016, the trial court appropriately denied Doleman's motion to sever the offenses. First, severance was not mandatory because all of the offenses

[6] Although the jury was read seventeen counts during Doleman and Lee's trial, four of those counts did not apply to Doleman. Moreover, the verdict form presented to the jury only allowed the jury to consider and convict Doleman on the thirteen charges that applied to him.

[7] Doleman's trial counsel told the court at the hearing that he had timely filed the motion, and the court's order recites that the court had read and considered the motion. However, the motion does not appear in the record.

involving Doleman, including the ones which did not occur on the day of the murder, reflected a continuous crime spree. This Court has held a defendant is not entitled to severance where a series of similar crimes "constituted parts of a single scheme or plan," even though acts occurred over a period of more than two weeks. Cooper v. State, 253 Ga. 736, 737 (3) (325 SE2d 137) (1985). Here, the crime spree consisted of an eight-week period during which the co-defendants committed a series of robberies and assaults using the same weapons and stolen vehicles from previous offenses. See Davis v. State, 279 Ga. 11 (608 SE2d 628) (2005) (severance was not mandatory where charges arose from two shooting sprees in which several people were injured and two victims were killed and where the State expected evidence to show that the crimes were part of a continuing crime spree connected to defendant's drug dealing). Further, because Doleman failed to prove he was prejudiced by the refusal to sever any of the related offenses, he cannot show that the trial court abused its discretion in denying the motion. See Kelly v. State, 267 Ga. 252, 253 (2) (477 SE2d 110) (1996) (it is not sufficient for appellant to raise the possibility that a separate trial would have given him or her a better chance of acquittal). Because Doleman failed to seek severance of his *trial* from that of Lee's, he forfeited the

option to seek severance from those *offenses* that involve Lee, but not Doleman. Durden v. State, 219 Ga. App. 732, 734 (2) (466 SE2d 641) (1995) (a defendant does not have a right to seek to sever a count that affects only a co-defendant where the defendant does not move to sever his or her trial from that of the co-defendant). The remaining count that did not include Doleman was the rape charge against Scott. However, because Doleman was never charged with the rape in the indictment, the jury was unable to convict him of this charge. Further, Scott pled guilty to and admitted full responsibility for the rape charged in the indictment and testified at trial, taking full responsibility for the rape. Thus, while neither Lee nor Doleman was involved in this act, there was no confusion or prejudice in the trial court's refusal to sever this offense.

4. Doleman asserts that the trial court committed plain error by failing, sua sponte, to instruct the jury that, if it returned a verdict of guilty as to either of the murder counts, a sentence of life in prison would be mandatory.[8] We disagree.

---

[8] OCGA § 16-5-1 (e) (1) ("A person convicted of the offense of murder shall be punished by . . . imprisonment for life without parole, or by imprisonment for life."); OCGA § 17-8-58 (b) ("Failure to object [to a portion of a jury charge] shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties.").

12

The question before this Court is whether the failure to give such an instruction constituted plain error. To meet the plain error standard,

> [f]irst, there must be an error or defect — some sort of "[d]eviation from a legal rule" — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the trial court proceedings." Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"

(Citation, punctuation and emphasis omitted.) State v. Kelly, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

Specifically, Doleman argues that the rationale behind the well-established practice of withholding sentencing information in non-capital felony cases before the jury has reached a verdict should not apply here because the jury's decision itself legally mandates a specific punishment, and withholding that amounts to a denial of due process. But, Doleman has not cited any controlling legal authority that demonstrates that not instructing the jury about sentencing prior to their determination is an error that is "clear or obvious, rather than

13

subject to reasonable dispute." See <u>Kelly</u>, supra, 290 Ga. at 33 (2) (a). See also <u>State v. Herrera-Bustamante</u>, 304 Ga. 259, 264 (2) (b) (818 SE2d 552) (2018) ("An error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point.") (Citation and punctuation omitted.). In fact, we have held otherwise. See <u>Johnson v. State</u>, 276 Ga. 57, 59 (2) (573 SE2d 362) (2002) ("[T]he trial court did not err when it declined to inform the jury that, should he be found guilty, appellant faced a minimum sentence of ten years' imprisonment."). As such, Doleman has not shown any error in this regard, much less a clear and obvious one. See <u>Willis v. State</u>, 304 Ga. 686, 719-720 (820 SE2d 640) (2018).

    <u>Judgment affirmed. All the Justices concur</u>.

Decided December 10, 2018.

Murder. Muscogee Superior Court. Before Judge Smith.

Bentley C. Adams III, Clark C. Adams, Jr., for appellant.

Julia F. Slater, District Attorney, Wesley A. Lambertus, Frederick Lewis, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General, for appellee.